UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

HILMI JUDEH                                    CIVIL ACTION

VERSUS                                         NO: 12-1758

LOUISIANA STATE UNIVERSITY                     SECTION: R(4)
SYSTEM, et al.

<u>**ORDER AND REASONS**</u>

Before the Court is the motion for summary judgment of defendants Dr. Stephanie Tortu and Dr. Donna Williams.  For the reasons that follow, the Court GRANTS defendants' motion.

**I.   BACKGROUND**

This dispute stems from plaintiff Hilmi Judeh's dismissal from the Louisiana State University School of Public Health ("LSU-SPH"). Plaintiff enrolled in a Master's of Public Health program in the summer of 2010.[1]  In the spring semester of 2011, plaintiff withdrew for personal reasons.  Upon his return to the LSU-SPH in the summer of 2011, plaintiff secured an internship at the Louisiana Office of Public Health ("OPH") in order to fulfill the degree requirement that he obtain 200 hours of practice experience.[2]  He began his internship on June 2, 2011.[3]  Some time before June 24, 2011, plaintiff was accused of verbal

_____

[1]    R. Doc. 1 at 4.

[2]    R. Doc. 52-3 at 1-2; R. Doc. 55-1 at 1.

[3]    R. Doc. 52-3 at 2; R. Doc. 55-1 at 1.

harassment by a fellow intern.[4]  Plaintiff also was "having
problems" with his immediate supervisor, Megan Jespersen,
involving plaintiff's alleged failure to complete tasks, to
maintain patient confidentiality, to follow instructions, to
respect authority, and to use the internet appropriately.[5]  On
June 24, 2011, plaintiff sent an email to Dr. Donna Williams,
Practice Experience Course Director for the LSU-SPH, asking to
switch practice sites.[6]  In the email, plaintiff indicated that
he had been falsely accused of misconduct and that there was
insufficient work for him at the site.[7]  He also indicated that
Jespersen had advised him to seek a different placement.[8]
Plaintiff thereafter secured an alternative internship within the
LSU-SPH rather than returning to the OPH.[9]

    Once he concluded his internship with the OPH, plaintiff
posted a number of comments to his Facebook page in which he
threatened to return to the OPH to embarrass the intern who
accused him of harassment and to destroy the work plaintiff had

---

[4]     R. Doc. 52-3 at 2; R. Doc. 52-4 at 49-51; R. Doc. 55-1
        at 1.

[5]     R. Doc. 52-3 at 2; R. Doc. 55-1 at 1.

[6]     R. Doc. 52-5 at 9.

[7]     *Id.*

[8]     *Id.*

[9]     R. Doc. 55-2 at 1.

completed during his internship.[10]  Specifically, plaintiff
stated on Sunday, June 26, 2011, that he was "going to go into my
old internship site tomorrow delete the database I created and
toss all the interviews I did in the paper shredder."[11]  The
following Monday, despite having agreed with Jespersen not to
return to the OPH, plaintiff returned unannounced.[12]

When OPH learned of plaintiff's Facebook comments, OPH
officials sought a meeting with LSU-SPH administrators.[13]
Officials from both institutions met on July 1, 2011, and OPH
officials provided the LSU-SPH administrators with copies of
plaintiffs' Facebook threats.[14]  Before the Fourth of July
holiday weekend, a number of LSU-SPH administrators continued
their discussions regarding plaintiff's misconduct.[15]

On the morning of July 5, 2011, the Associate Dean for
Academic Affairs, Dr. Stephanie Tortu, called the plaintiff into
her office to discuss the Facebook posts.[16]  Dr. Williams was

---

[10]   R. Doc. 52-4 at 37-41.

[11]   R. Doc. 52-3 at 2-3; R. Doc. 55-1 at 2.

[12]   R. Doc. 52-3 at 3; R. Doc. 55-1 at 2.

[13]   R. Doc. 52-3 at 3; R. Doc. 55-1 at 2.

[14]   R. Doc. 52-3 at 3; R. Doc. 55-1 at 2.

[15]   R. Doc. 52-3 at 3; R. Doc. 55-1 at 2.

[16]   R. Doc. 55-2 at 1.

also present at the meeting.[17]  During the meeting, Drs. Tortu
and Williams informed the plaintiff that he faced discipline for
the threats made on Facebook.[18]  Drs. Tortu and Williams contend
that they showed the plaintiff printouts of the Facebook posts
and offered him a chance to respond to the charges.[19]  They
allege that the plaintiff only confirmed his guilt by insisting
that he was not really going to carry out the threats.[20]  The
defendants state that Dr. Tortu then expelled the plaintiff for
making threats to destroy government property.[21]  Dr. Tortu
alleges that she handed the plaintiff a copy of Chancellor's
Memorandum 56, which delineates the appeals process, and informed
him of his right to appeal.[22]

Plaintiff disputes the defendants' account of their meeting.
He alleges that upon entering Dr. Tortu's office, Dr. Tortu
informed him that he would be dismissed from the LSU-SPH for
"saying that [he was] going to destroy data at [his] practice
experience."[23]  Plaintiff asserts that Dr. Tortu refused to

---

[17]  *Id.*

[18]  R. Doc. 52-3 at 3; R. Doc. 55-1 at 2.

[19]  R. Doc. 52-6 at 1; R. Doc. 52-7 at 1.

[20]  R. Doc. 52-6 at 1; R. Doc. 52-7 at 2.

[21]  R. Doc. 52-6 at 1; R. Doc. 52-7 at 2.

[22]  R. Doc. 52-6 at 2.

[23]  R. Doc. 55-2 at 1.

discuss the matter when he asked "Are we going to talk about this?" and that he was not given an opportunity to explain himself.[24]  He also contends that he received only a "redacted" version of Memorandum 56, which was missing the information relating to student rights and the appeals process.[25]  He also disputes that he was given a copy of the Facebook posts in question at the meeting, although he admits that he knew the posts were the reason for his dismissal.[26]

Later that day, plaintiff sent an email to Dr. Elizabeth Fontham, Dean of the LSU-SPH, objecting to his dismissal and alleging that Dr. Tortu denied him due process by not allowing him to explain the circumstances behind his "statement of frustration."[27]  In the email, plaintiff admitted to making the statements on Facebook but argued that he "was only expressing anger at an injustice [he] perceived to have received from [Megan Jespersen] in which she reduced [his] hours for practice experience from 67 hours to 57."[28]  He went on to assure Dean Fontham that he in no way acted on the threats, as he knew such

---

[24]    *Id.* at 1-2; R. Doc. 52-5 at 3.

[25]    *Id.* at 1.

[26]    *Id.*; R. Doc. 52-4 at 36.

[27]    R. Doc. 52-5 at 3.

[28]    *Id.*

actions "could have repercussions beyond the academic domain and could actually lead to criminal litigation."[29]

Dean Fontham forwarded plaintiff's email to Drs. Tortu and Williams, indicating that she would encourage the plaintiff to follow the appeals process in Memorandum 56, but that she would first like to hear the defendants' comments on the email.[30]  Dr. Tortu responded: "I think his action on facebook was very serious, even in jest (how were we to know it was in jest?). Plus, he has a history of inappropriate behavior toward women."[31] When Dean Fontham asked Dr. Tortu if she had discussed the harassment allegations as well as the Facebook threats with the plaintiff and given him an opportunity to "present his side," Dr. Tortu replied: "His only 'side' was to say he meant his threat in jest!  I didn't discuss the sexual harassment stuff because it was already discussed at the Office of Public Health.  That's why he was removed from OPH and working on Donna[ Williams's] project."[32]  Dr. Williams also replied, confirming that the plaintiff "was given the opportunity to present his side."[33]

---

[29]     *Id.*

[30]     *Id.* at 2.

[31]     *Id.*

[32]     *Id.*

[33]     *Id.*

Three days after his dismissal, plaintiff sent a letter to
Dr. Tortu requesting an appeal.[34]  Dr. Tortu forwarded the letter
to Joseph Moerschbaecher, Vice Chancellor for Academic Affairs at
the LSU Health Sciences Center, but it is unclear what action, if
any, was immediately taken.[35]  On July 12, 2011, plaintiff
received a letter from Dr. Tortu, documenting plaintiff's
expulsion.  It read in part:

> Only July 5, 2011, Dr. Donna Williams and I met with you to
> inform you that were [sic] formally dismissed from the LSU
> School of Public Health for inappropriate and grossly
> unprofessional behavior, both on campus and at your practice
> experience site at the Louisiana Office of Public Health.  I
> provided you with a copy of CM-56 for your information.  We
> were aware that several complaints were made by female
> students and staff at the Office of Public Health regarding
> your inappropriate behavior.  After you were reprimanded,
> you posted remarks on your Facebook page indicating that, in
> retaliation, you intended to destroy data belonging to the
> Louisiana Office of Public Health, as well as embarrass a
> staff member during a meeting.  The Director of the Office
> of Public Health STD/HIV Program, Dr. DeAnn Gruber, notified
> the course director for PUBH 6800, the practice experience
> (Dr. Donna Williams) and your advisor (Dr. Ariane Rung)
> about your behavior.  After discussion, we considered your
> actions serious enough to warrant immediate dismissal.  Dean
> Fontham was aware of these events, and she concurred with
> this decision.[36]

On July 17, 2011, plaintiff emailed Vice Chancellor
Moerschbaecher to request an appointment to discuss his

---

[34]     R. Doc. 52-6 at 2; R. Doc. 52-4 at 48.

[35]     R. Doc. 52-6 at 2.

[36]     R. Doc. 55-3 at 1.

expulsion.[37]  Dean Fontham relayed the details of the expulsion
to Vice Chancellor Moerschbaecher in anticipation of the meeting,
noting that "[s]ince his comments were on face book [sic] for
many to see there was no issue as to whether he did or didn't
threaten to destroy [OPH] data.  His defense is that he is very
excitable and he didn't really mean that he would destroy their
data."[38]

Defendants allege, and the plaintiff admits, that plaintiff
"had an appeal hearing with Vice Chancellor Joseph
Moerschbaecher, III," and that during the appeal "plaintiff was
given another chance to present his defense."[39]  In his
deposition, plaintiff claimed that Vice Chancellor Moerschbaecher
told him, "[y]ou said you were going to destroy data and that's
why you were expelled. . . . If you said it, you're still
expelled.  If you didn't say it, you can come back to school."[40]

Vice Chancellor Moerschbaecher offered plaintiff the option
to resign from school to avoid any and all discipline.[41]  On July
29, 2011, plaintiff sent an email to Vice Chancellor
Moerschbaecher's assistant, indicating that he wished to "drop

---

[37]   R. Doc. 52-5 at 16.

[38]   *Id.*

[39]   R. Doc. 52-3 at 4;  R. Doc. 55-1 at 3.

[40]   R. Doc. 52-4 at 75.

[41]   R. Doc. 52-3 at 4;  R. Doc. 55-1 at 3.

[his] appeal and take the option of resigning."[42]  Plaintiff admits that he "freely chose to resign."[43]  He later enrolled at the University of New Orleans, where he completed a Master's in Science and Healthcare Management.[44]  He alleges that this program is not an equivalent of the SPH's Master's in Public Health Program, and that he was able to transfer only a "minimal number" of credit hours.[45]

Plaintiff then brought an action under 42 U.S.C. § 1983 against Elizabeth Fontham, Stephanie Tortu, Donna Williams, Ariane Rung, and Joseph Moerschbaecher in their official and individual capacities, as well as against the LSU System and the LSU Health Sciences Center.  He claimed that his First, Fifth, and Fourteenth Amendment rights were violated by his dismissal from the school.  Defendants filed motions to dismiss.  Plaintiff acquiesced in the dismissal of his claims against the individual defendants in their official capacities, indicating that he was seeking only monetary damages rather than prospective or injunctive relief.[46]  The Court granted defendants' motions in part, but denied the motions as to plaintiff's procedural due

---

[42]  R. Doc. 52-5 at 18.

[43]  R. Doc. 52-3 at 4; R. Doc. 55-1 at 3.

[44]  R. Doc. 52-4 at 13.

[45]  R. Doc. 1 at 7.

[46]  R. Doc. 30 at 1; R. Doc. 23 at 1.

process claims against Drs. Tortu and Williams.  The defendants now have moved for summary judgment on plaintiff's due process claim.

## II.  STANDARD

Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994). When assessing whether a dispute as to any material fact exists, the Court considers "all of the evidence in the record but refrains from making credibility determinations or weighing the evidence." *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 398 (5th Cir. 2008). The Court must draw all reasonable inferences in favor of the nonmoving party, but "unsupported allegations or affidavits setting forth ultimate or conclusory facts and conclusions of law are insufficient to either support or defeat a motion for summary judgment." *Galindo v. Precision Am. Corp.*, 754 F.2d 1212, 1216 (5th Cir. 1985) (internal quotation marks omitted).

If the dispositive issue is one on which the moving party will bear the burden of proof at trial, the moving party "must come forward with evidence that would entitle it to a directed

verdict if the evidence went uncontroverted at trial." *Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1263-64 (5th Cir. 1991)(citation omitted). The nonmoving party can then defeat the motion by either countering with sufficient evidence of its own, or "showing that the moving party's evidence is so sheer that it may not persuade the reasonable fact-finder to return a verdict in favor of the moving party." *Id.* at 1265.

If the dispositive issue is one on which the nonmoving party will bear the burden of proof at trial, the moving party may satisfy its burden by merely pointing out that the evidence in the record is insufficient with respect to an essential element of the nonmoving party's claim. *See Celotex*, 477 U.S. at 325. The burden then shifts to the nonmoving party, who must, by submitting or referring to evidence, set out specific facts showing that a genuine issue exists. *See id.* at 324.

The nonmovant may not rest upon the pleadings, but must identify specific facts that establish a genuine issue for trial. *Id.* at 325. *See also Little*, 37 F.3d at 1075 ("Rule 56 '*mandates* the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'") (citing *Celotex*, 477 U.S. at 332).

11

## III. DISCUSSION

Defendants contend that plaintiff has failed to allege a due process violation that would overcome their defense of qualified immunity.  It is well established that qualified immunity shields public officials from suit and liability under § 1983, "unless their conduct violates clearly established statutory or constitutional rights of which a reasonable person would have known." *Babb v. Dorman*, 33 F.3d 472, 477 (5th Cir. 1994). When a defendant invokes qualified immunity, the plaintiff bears the burden of demonstrating that the defense is inapplicable through a two-prong test. *McClendon v. City of Columbia,* 305 F.3d 314, 323 (5th Cir. 2002) (en banc). Plaintiff first must "claim that the defendants committed a constitutional violation under current law." *Atteberry v. Nocona Gen. Hosp.*, 430 F.3d 245, 253 (5th Cir. 2005). Plaintiff must then claim that defendants' actions were objectively unreasonable in light of the law that was clearly established at the time of the actions complained of. *Id*. "To be "clearly established' for purposes of qualified immunity, [t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Club Retro, L.L.C. v. Hilton*, 568 F.3d 181, 194 (5th Cir. 2009) (internal citation omitted).  Because the Court finds that plaintiff's expulsion accorded with the

requirements of due process, it need not reach the second prong of the qualified immunity analysis.

Due process requires that a student facing discipline "be given oral or written notice of the charges against him and, if he denies them, an explanation of the evidence the authorities have and an opportunity to present his side of the story." *Goss v. Lopez,* 419 U.S. 565, 581 (1975). All that is required is an "informal give-and-take" between the student and the decision makers. *Id.* at 584. "There need be no delay between the time 'notice' is given and the time of the hearing." *Id.* at 582. Nor must the administrator "afford the student the opportunity to secure counsel, to confront and cross-examine witnesses supporting the charge, or to call his own witnesses to verify his version of the incident." *Id.* at 583.

While such discussion "will add little to the fact-finding function where the disciplinarian himself has witnessed the conduct forming the basis for the charge . . . the student will at least have the opportunity to characterize his conduct and put it in what he deems the proper context." *Id.; accord Meyer v. Austin Indep. Sch. Dist.*, 161 F.3d 271, 274-75 (5th Cir. 1998). It is clearly established law in this circuit that school officials are required to permit a student to present his side of the story. *Swindle v. Livingston Parish Sch. Bd.*, 655 F.3d 386, 401-02 (5th Cir. 2011).

*Goss* addressed the rights of a public school student facing a short-term suspension of up to ten days.  The Court observed that longer suspensions "may require more formal procedures." *Goss*, 419 U.S. at 584.  The Court acknowledges, however, that "the timing and content of the notice and the nature of the hearing will depend on appropriate accommodation of the competing interests involved.  419 U.S. at 579.  In this circuit, unless the unique circumstances require otherwise, courts require nothing more than an informal *Goss* hearing before dismissing a college or graduate student.  *See Esfeller v. O'Keefe*, 391 F. App'x 337, 342 (5th Cir. 2010) (suggesting that college student facing lengthy suspension was entitled to no more process than *Goss* requires); *Willis v. Texas Tech University Health Sciences Center*, 394 Fed.App'x 86, 87 (5th Cir. 2010) (applying *Goss* requirements to college student's expulsion hearing).[47]  *See also Clarke v. Univ. of N. Texas*, 993 F.2d 1544 (5th Cir. 1993)("It may well be that in the university environment, the nature of

---

[47] Plaintiffs cite a 50-year-old, pre-*Goss* Fifth Circuit case in support of their argument that more rigorous procedures are required to expel a university student. However, that case made clear that "[t]he nature of the hearing should vary depending upon the circumstances of the particular case" and merely prescribed the procedures necessary in that instance. *Dixon v. Alabama State Bd. of Ed.*, 294 F.2d 150, 158 (5th Cir. 1961).

academic requirements and the special sense of community support less formal procedures than in pre-college education.").

## A.   Plaintiff Had an Opportunity to Respond to the Charges.

Plaintiff argues that summary judgment is not warranted because a factual dispute exists as to whether he was provided an opportunity to respond to the charges at his meeting with Drs. Tortu and Williams.  Even accepting as true plaintiff's assertions that he neither admitted nor explained his conduct to Dr. Tortu during the hearing, it would be the height of technicality to suggest that the flexible requirements of *Goss* were not satisfied in this case.  *Goss* emphasized the importance of permitting a student *who denies the charges against him* to present his side of the story.  *Watson ex rel. Watson v. Beckel*, 242 F.3d 1237, 1242 (10th Cir. 2001) (quoting *Goss*, 419 U.S. at 581).  Plaintiff has never suggested that he denied the charges in the meeting with Drs. Tortu and Williams.  On the contrary, within hours of his expulsion, plaintiff had admitted in writing to making the threats against OPH property, and he continues to acknowledge his guilt to this day.  His only complaint to Dean Fontham, made immediately after his meeting with Drs. Tortu and Williams—and indeed his only claim before this Court—is that he was not permitted to "explain the circumstances behind [his] statement of frustration."  Yet plaintiff's email to Dean Fontham did just that, and the record reveals that Dean Fontham, who

exercised supervisory power over the defendants in her capacity as Dean of the LSU-SPH and who participated in the decision to expel plaintiff,[48] considered plaintiff's explanation and discussed it in writing with Drs. Tortu and Williams.  The evidence indicates that Dean Fontham, having the power to prevent plaintiff's expulsion, considered his arguments, discussed them with Drs. Tortu and Williams, made inquiry into the details of the conversation with plaintiff, and concurred in the decision to expel the plaintiff *before* advising him to initiate the appeals process.  The Court can only conclude from these facts that plaintiff was given an opportunity to present his side of the story in a meaningful way in connection with the initial decision to expel him.  The law requires nothing more.

The Court also notes that there is a line of cases in this circuit and elsewhere holding that a plaintiff must demonstrate substantial prejudice in order to mount a successful due process claim and that a student's admission to the charges against him is relevant to determine whether such prejudice exists.  In *Keough v. Tate County Bd. of Ed.*, 748 F.2d 1077 (5th Cir. 1984), the Fifth Circuit upheld a district court's determination that even if a student's procedural due process rights had been

---

[48] The expulsion letter plaintiff received from Dr. Tortu stated "Dean Fontham was aware of these events, and she concurred with this decision."  R. Doc. 55-3.  Additionally, plaintiff himself alleges that Dean Fontham participated in the decision to expel him.  R. Doc. 1 at 6.

16

violated, he was not entitled to relief because he had suffered no attributable harm. The Court held:

> To establish a denial of procedural due process, a party must show substantial prejudice. *U.S. Pipe & Foundry v. Webb*, 595 F.2d 264, 274 (5th Cir. 1979); *Arthur Murray Studio of Washington, Inc. v. Federal Trade Commission*, 458 F.2d 622, 624 (5th Cir. 1972). Whether Keough admitted the charges therefore is relevant in determining substantial prejudice or harm. . . . Clearly there was substantial evidence to support the district court's finding that Keough admitted the charges and therefore his suspension did not result from a procedural due process deprivation. See Fed.R.Civ.P. 52. The district court did not err in finding that a procedural due process violation, if any, did not cause injury to Keough.

748 F.2d at 1083. Subsequent cases in this and other circuits have cited *Keough* for the proposition that prejudice is required to prevail on a procedural due process claim stemming from a student's academic suspension or dismissal. *See Porter v. Ascension Parish Sch. Bd.*, 393 F.3d 608, 624 (5th Cir. 2004) ("Whether a student 'admitted the charges' leveled against him is 'relevant in determining substantial prejudice or harm.'"); *Watson,* 242 F.3d at 1242 ("Because Mr. Watson candidly admitted his guilt, Mr. Watson was not prejudiced by a lack of notice. . . . Mr. Watson, therefore, failed to establish a due process violation."); *Chalmers v. Lane*, CIV.A.3:03-CV-1268-B, 2005 WL 169990, at *8-9 (N.D. Tex. Jan. 25, 2005) ("Because Chalmers failed to present evidence that the outcome of the disciplinary proceedings would have been different had Defendants not committed the due process violations he alleges, Chalmers has not

17

met his burden of demonstrating that he was substantially prejudiced by any alleged due process violations."); *Boster v. Philpot*, 645 F. Supp. 798, 805 (D. Kan. 1986) ("Even if this court were to find that the procedures employed by defendant Philpot technically violated the requirements of K.S.A. 72–8902, the students would still be unable to show that they suffered any prejudice so as to establish a denial of due process. By admitting their guilt, the plaintiffs waived their right to a hearing."). *See also S.K. v. Anoka-Hennepin Indep. Sch. Dist. No. 11*, 399 F. Supp. 2d 963, 968-69 (D. Minn. 2005) (citing *Keough* and finding no prejudice and no due process violation, because students admitted to conduct forming the basis of their expulsion by pleading guilty to related criminal charges four months later).

It is clear from the communications among Dean Fontham, Drs. Tortu and Williams, and Vice Chancellor Moerschbaecher that all four were aware of defendant's explanation for his behavior and considered it irrelevant to the question of whether his threats warranted expulsion. Indeed, they were of the mind that the threats *per se* were grounds for dismissal, irrespective of plaintiff's state of mind when he made them. Thus, plaintiff would have been expelled regardless of whether he was initially given the opportunity to present his explanation. It is therefore abundantly clear that plaintiff has experienced no

prejudice.  That plaintiff had an appeal hearing with Vice Chancellor Moerschbaecher in which he was able to present his defense, and yet plaintiff was not reinstated as a result of that hearing, only reinforces this conclusion.

The Court does not decide this case on the basis of *Keough* and its progeny, because there is an inherent tension between that line of cases and the Supreme Court's holding in *Carey v. Piphus*, 435 U.S. 247, 266-67 (1978).  In that case, the Court recognized a plaintiff's freestanding right to adequate process, regardless of the merits of his substantive defense.  The Court held that a plaintiff who has suffered no injury as a result of a due process violation still would be entitled to "nominal damages not to exceed one dollar."  *Id.*  Here, the Court bases its decision to grant summary judgment on the sufficiency of the process provided to the plaintiff.  It notes, however, that the lack of demonstrable prejudice in this case compels the conclusion that even under *Carey,* if plaintiff *could* establish a due process violation, he would be entitled to no more than one dollar in nominal damages.  A necessary corollary to that result would be the denial of an award of attorney's fees under 42 U.S.C. § 1988.  *See Farrar v. Hobby*, 506 U.S. 103 (1992) ("When a plaintiff recovers only nominal damages because of his failure to prove an essential element of his claim for monetary relief, the only reasonable fee is usually no fee at all.") (citations

19

omitted); *Hidden Oaks Ltd. v. City of Austin*, 138 F.3d 1036, 1053 (5th Cir. 1998) (applying *Farrar* in affirming the denial of attorney's fees).

**B.   Notice Was Adequate**.

Plaintiff also argues that he received inadequate notice of the charges against him, because the LSU-SPH administrators may have considered misconduct other than the Facebook posts in deciding to expel him. Dr. Tortu's letter memorializing the expulsion hearing indicated that his dismissal was the result of "inappropriate and grossly unprofessional behavior, both on campus and at your practice experience site at the Louisiana Office of Public Health." Though the letter reveals that the administrators were aware of the complaints regarding plaintiff's behavior when he interned at the OPH, it refers to these complaints only in describing the impetus for plaintiff's retaliatory Facebook threats. Similarly, Dean Fontham's email to Drs. Tortu and Williams, in which she asked defendants if they had discussed "the initial complaint at OPH" with plaintiff during the hearing, does not suggest that the administrators based their decision to expel the plaintiff on the complaints of verbal harassment and poor performance. Dr. Tortu's response indicates that she chose not to discuss the harassment complaints "because it was already discussed at the Office of Public Health. That's why he was removed from OPH and working on Donna's

project."  In other words, Dr. Tortu felt it unnecessary to rehash earlier complaints against the plaintiff when those complaints had been addressed already.  The purpose of the hearing was to address the subject of the OPH's complaint against plaintiff and the basis for the expulsion: the threat to destroy government property.

In any event, it would not be inappropriate for the defendants to justify plaintiff's dismissal on additional grounds, because plaintiff was notified of the conduct that resulted in the decision to expel him.  *See Watson,* 242 F.3d at 1242 ("[B]ecause Mr. Watson received proper notice regarding the charge of assault and was expelled for the assault, Mr. Watson would not be prejudiced by the board justifying expulsion on additional grounds.") (citing *Smith v. Severn*, 129 F.3d 419, 428 (7th Cir.1997) (holding that when a student receives proper notice of a charge and is suspended on the basis of that charge, justifying the suspension by finding additional violations does not constitute a due process violation)).  Viewing the evidence in the light most favorable to the plaintiff, he has failed to demonstrate a dispute of material fact as to whether he received adequate notice of the charges.

**IV.   CONCLUSION**

For the foregoing reasons, the Court GRANTS the defendants' motion for summary judgment.

New Orleans, Louisiana, this 10th day of October, 2013.

SARAH S. VANCE

UNITED STATES DISTRICT JUDGE

22